### RHODES and others v. CLEVELAND ROLLING-MILL Co.

*(Circuit Court N. D. Illinois.   July 28, 1883.)*

1. PAROL EVIDENCE—TO EXPLAIN WRITTEN CONTRACT.
   While parol evidence is not admissible to vary or change the terms of a written contract, it is frequently admissible for the purpose of ascertaining what was the intention of the parties, or the meaning which they intended to attach to the expressions used in the contract.

2. SAME—CONTRACT TO DELIVER PIG-IRON—BREACH.
   The contract in this case, claimed to have been broken by defendant, construed, and *held* that there was nothing to justify defendant in claiming that under said contract the whole amount of pig-iron to be delivered by plaintiffs to them was to be delivered before the end of the year, but that defendant must be held to have known of the capacity of the mill from which the iron was to be produced, and that its refusal to receive the iron after the close of the year was a breach of its contract with plaintiff, and that plaintiffs were entitled to damages therefor.

3. SAME—MEASURE OF DAMAGES.
   Ordinarily, the measure of damages for a breach of a contract of sale is the difference between the price which defendant, by the contract, agreed to pay, and the market value of the property at the time he refused to perform the contract.

4. SAME—NOTICE OF REFUSAL TO ACCEPT PROPERTY—TENDER.
   Where, however, defendant notifies plaintiff that no more of the property will be received after a date specified, and after such notice plaintiff tenders

the balance of the property under the contract, if the price of the property has advanced between the time of such notification and the date of the tender, so as to make less difference between the contract price and the market price, the difference between the market price and the contract price at the time of the tender would be the measure of damages.

At Law.

*Emery A. Storrs,* for plaintiffs.

*Lawrence, Campbell & Lawrence,* for defendant.

BLODGETT, J.    This is a suit to recover damages for the breach of an agreement in writing made between the plaintiffs and the defendant, on the sixteenth day of February, 1880, whereby plaintiffs sold to defendant the entire product of 14,000 tons of iron ore, which was to be manufactured into pig-iron with charcoal by the Leland Furnace Company, of Leland, Michigan, which was to be shipped in vessel cargoes as rapidly as possible to the defendant at Cleveland, Ohio, during the season of navigation of 1880, and such portion of the product of said ore as should be made after the close of navigation for the season of 1880, was to be shipped by vessel to Cleveland on the opening of navigation for the season of 1881, or as near the opening as possible, and for which iron the defendant agreed to pay plaintiffs $45 cash per ton of 2,240 pounds as rapidly as the same was delivered on the arrival of the vessel at Cleveland.    The plaintiffs caused to be manufactured and delivered by the Leland Iron Company to defendant, in pursuance of this contract, before the close of navigation of 1880, 3,421 tons and 480 pounds of pig-iron from the ore mentioned in the contract.

On the twenty-third of February, 1881, defendant notified the plaintiffs that it did not recognize any contracts with plaintiffs for pig-iron made after December 31, 1880, claiming that the contract had expired at that time; and on the first of March, 1881, defendant reiterated this notice to plaintiffs by telegraph in the following words: "Your contract to manufacture pig-metal for us gives you no authority to do so after December, 1880."    And the substance of this telegram was repeated in a letter from the president of the defendant company to plaintiffs under date of March 3d.    Afterwards, and about May 13, 1881, defendant offered to take the quantity of iron made prior to the first of January, and which had not been shipped, and which amounted to about 1,500 tons, with the understanding that they should be released from the obligations to receive any more iron under said contract.    This offer was rejected by plaintiffs.    Between the ninth of May and the second of July, 1881, the Leland Iron Company, for plaintiffs, shipped from Leland, Michigan, to the defendant the remainder of the iron manufactured out of said ore, and tendered the same to defendant at Cleveland, in conformity with the terms of plaintiff's contract with defendant; the amount so shipped in 1881 being 4,653 tons and 390 pounds, which defendant refused to receive.    This suit is now brought to recover damages for this alleged breach of defendant's contract.

The facts which seem to me material to the decision of this case are briefly these:

Prior to January 14, 1880, the plaintiffs had made contracts with the Cleveland Mining Company for the purchase of 6,000 tons of iron ore, to be mined from the mine of said company, and with the Menominee Mining Company for the purchase of 5,000 tons of iron ore, to be mined from what was known as the "Norway mine," owned by said Menominee Mining Company; and with the Rolling-mill Mine Company for the purchase of 1,500 tons of ore, to be mined from the mine of said company; and with the Lumberman's Mining Company for the purchase of 1,500 tons of ore, to be mined from the "Stevenson" mine, owned by said company,—all said ores to be delivered by said mining companies to plaintiffs before the first of October, 1880; and on the fourteenth of January plaintiffs entered into an agreement in writing with the Leland Iron Company, who was the owner and manager of a furnace located at Leland, Michigan, by which plaintiffs sold to said Leland Iron Company the said 6,000 tons of "Cleveland ore," 5,000 tons of "Norway ore," 1,500 tons "Rolling-mill ore," and 1,500 tons "Stevenson ore," and agreed to purchase the entire product of the pig-iron to be made with charcoal from the said ores, for which plaintiffs were to pay the said Leland Iron Company at the rate of $40 per ton, delivered over the rail at Chicago, or $40.25 per ton, delivered in the same way at Cleveland, Ohio, at the option of plaintiffs,—the plaintiffs to provide proper dock facilities for the prompt unloading of vessels; and the Leland Iron Company agreed to manufacture pig-iron from the said ores, as nearly as practicable, of the "grade which the plaintiffs might desire, and to ship the same in cargo lots, as rapidly as possible after manufacture, during the season of navigation, to said plaintiffs, to Chicago or Cleveland, as aforesaid;" the plaintiffs agreeing that said ores should be delivered to the Leland Iron Company, 1,500 tons in May, 1880, and 2,500 tons each month thereafter, as nearly as may be; all to be delivered to vessels before November 1, 1880, and in suitable quantities of each for the mixture desired by said plaintiffs. There is no doubt, from the proof, that plaintiffs commenced the shipment of ore to the Leland Iron Company as early in the season of 1880 as navigation permitted, and that between the opening of navigation, 1880, and the first day of November of that year, there was delivered by the plaintiffs to the Leland Iron Company ore in pursuance of said contract as follows:

Cleveland ore, - - - - - - 5,980 tons.
Norway ore, - - - - - - 4,405 "
Rolling-mill ore, - - - - - 1,478 "
Stevenson ore, - - - - 2,305 "

Making a total of - - - - - 14,168 tons.

The Leland Iron Company, in pursuance of their contract with the plaintiffs, immediately on the receipt of said ore commenced the manufacture of pig-iron therefrom, as called for by their contract, and continued to manufacture and ship said iron, so that the quantity before named, of 3,421 tons and 450 pounds, was manufactured and duly delivered before the close of navigation, 1880, and defendant accepted and paid for the same; that the furnace of the Leland Iron Company was run to its full capacity, and there was no delay in the manufacture of iron by the furnace, save an unavoidable delay of about six days by reason of the breaking of an elevator; and that at the time of the last shipment there was nearly a cargo of iron ready for shipment, which it was intended in good faith to ship that fall, but the vessel was prevented from getting to the pier at Leland by reason of the unusually early closing of navigation that season. After the close of navigation for the season of 1880, the furnace continued the manufacture of said ore into pig-iron during the winter and

ensuing spring, and on the eighth of May, 1881, and from that time on until the second of July, 1881, shipments were made in cargo lots to the amount of 4,653 tons and 350 pounds of iron, made from said ore so sold by plaintiffs to the iron company. The proof shows clearly that the Leland Iron Company resumed the shipment of pig-iron, made from this ore, in cargo lots as soon as possible after the opening of navigation in the spring of 1881, and continued such shipment until the whole lot was shipped. It also shows that at the time of the opening of navigation the whole of the ore had not yet been manufactured, but what remained unworked at the opening of navigation was manufactured and ready for shipment as soon as the same could be readily shipped from Leland in the due course of business, after the shipment of that on hand, at the opening of navigation.

In the contract between plaintiffs and defendant it was provided "that in case of accident or strikes at the Leland furnace, resulting in the stoppage of said furnace, then the plaintiffs are not to be held responsible for the delivery of pig-iron under this contract beyond the responsibility of the Leland Iron Company to them under the contract between plaintiffs and the Leland Iron Company;" and the contracts between the plaintiffs and the mining companies of whom they had purchased the ore, and the contract of the plaintiffs with the Leland Iron Company for the sale of said ore and its manufacture into pig-iron, and the purchase thereof by plaintiffs from the Leland Company, were made a part of the contract between the plaintiffs and defendant. The defendant now contends that the legal construction of the contract with the plaintiffs requires that all this pig-iron was to be manufactured during the year 1880, and it is upon this construction of the contract that defendant insists that it had the right to refuse to receive any iron manufactured after December 31, 1880. This construction is contended for by defendant mainly upon the last clause in the contract between the plaintiffs and the Leland Iron Company, in which the latter agrees to manufacture pig-iron from said ores, "and to ship same in cargo lots as rapidly as possible after manufacturing, during season of navigation, to said Rhodes & Bradley, to Chicago or Cleveland."

While it is undoubtedly true that parol evidence is not admissible to vary or change the terms of a written contract, it is frequently admissible for the purpose of ascertaining what was the intention of the parties, or the meaning which they intended to attach to the expressions used in the contract. *Doyle* v. *Teas,* 4 Scam. 226. The proof in this case shows that while the negotiations were in progress between the plaintiffs and the defendant which resulted in the contract now in question, the defendant was informed that the capacity of the Leland Iron Company's furnace was from 20 to 25 tons per day. The proof also shows that at the time this contract was made this furnace had never exceeded an average product of $17\frac{1}{2}$ tons per day during any year after it was built, which was in 1869. The defendant was certainly chargeable with notice as to the geographical location of Leland, Michigan, where this furnace was situated; with knowledge of the fact that it was upon the eastern shore or coast of Lake Michigan, a short distance south of the entrance to Grand Traverse bay, and in a place comparatively difficult of access for vessels; that it had no natural or artificial harbor, but depended upon piers built out into the lake in an open roadstead. Knowing that this iron was to be manufactured at this furnace, defendant, in my estimation,

was chargeable with notice of the capacity of this furnace, or had at least sufficient notice to put it on inquiry, and that from this known capacity it was impossible for the furnace to manufacture 14,000 tons of iron ore into pig iron between the opening and the close of navigation for the year 1880. And so, also, before the furnace started in the spring, but after the contract between the parties was made, the defendant was notified by letter from the plaintiffs that the managers of the furnace hoped the product would be from 25 to 30 tons per day. The language of this letter is: "We think the furnace ought to make from 25 to 30 tons per day, perhaps more; cannot tell until she gets well under way. We make 50 tons at Bangor. The Leland may come up to that, as Henry Ford, who used to be at Bangor, is at Leland now." To this information as to the probable product of the furnace, defendant took no exception, and made no objection, and the furnace, as the proof shows, from the time it started until the close of navigation, made an average of about $22\frac{1}{2}$ tons of pig-iron per day. After the close of navigation there was at one time a suspension of about two weeks for want of charcoal; and at another occasion it ran for a time under check for want of a sufficient supply of charcoal. The proof does not show by whose fault this suspension and delay occurred, but assuming that it was the fault of the Leland Company, it cuts so unimportant a figure in the rights of the parties, that I think very little consequence should be attached to it. If there was some slight delay it could have been corporated in damages to defendant, but there is no proof that defendant sustained any damage by such delay, and, in my estimation, it furnished no valid reason why defendant should be allowed to rescind the contract. Reading the contract between the plaintiffs and the Leland Iron Company in the light of the facts, as to where this furnace was situated and its capacity, no sane man would have a right to expect that this 14,000 tons of ore would be fully manufactured into pig-iron between the middle of May and the thirty-first of December, 1880. The total product of this ore in round numbers was 8,000 tons, which, at 25 tons per day, would take 320 full working days, and it could hardly be expected that a run of that extent could be kept up for 320 consecutive working days. Allowance must be made for accidents, delays, and the failure of human calculation to some extent, of which business men making contracts for performance in the future must take some notice. And therefore I hold that it must have been in the contemplation of these parties, at the time of making this contract, that this iron could not and would not be made by or before the end of the year 1880. The words "shipped as rapidly as possible after manufacture, during season of navigation," in the contract between plaintiffs and the Leland Company, do not, in my estimation, imply of themselves that the shipment was to be made during the season of navigation of the year 1880. But inasmuch as the Leland Iron Company was to transport this iron in vessel cargoes to Chicago or Cleve-

land, where the same was to be delivered to the plaintiffs, they had the right to suspend such transportation during the suspension of navigation, so that what was not manufactured and shipped during the season of navigation of 1880 was to be manufactured afterwards and shipped during the season of navigation of the next year or years.

This contract between plaintiffs and defendant provided in express terms for delays by accidents or strikes at the Leland furnace, resulting in the stoppage of said furnace and at the mines, and it may be readily imagined that a contract of this magnitude might not have been executed by reason of contingencies thus anticipated, even beyond the season of 1881. I am, therefore, of opinion that nothing in the contract between the plaintiffs and the Leland Iron Company justifies the assumption that this iron was to be all manufactured before the first of January, 1881. The terms of the contract between the plaintiffs and defendant certainly seem to have contemplated that all the iron would not be manufactured during the year of 1880. The provision is that the iron is to be shipped in vessel cargoes to the defendant at Cleveland during the season of navigation of 1880, and such portion of the product of said ore as is made after the close of navigation of 1880 is to be shipped by vessel to Cleveland on the opening of navigation of 1881, or as near the opening as possible. Certainly this language is so used as to clearly convey the idea that the parties intended and expected that a portion of this ore would not be manufactured into pig iron during the year 1880, and that the manufacture of what was not made and shipped before the close of navigation of 1880 was to go on and be completed, and the shipments made as rapidly as possible on the opening of navigation for the season of 1881. The words "as soon as possible," here used, are equivalent in their legal effect and meaning to the words "with all reasonable diligence," or "without unreasonable delay;" and there is nothing in the proof in this case to show that there was any unreasonable delay; and yet, as early as January 1, 1881, the defendant, by telegram to the plaintiffs, intimates that it wishes to know the amount of iron on hand manufactured up to December 31, 1880, and the later communications from the defendant to the plaintiffs show that this information was for the purpose of enabling the defendant to take the position that it would only receive so much of such iron as was manufactured up to and including the said thirty-first day of December.

There is nothing in the terms of the contract which fixes any certain or definite time within which the manufacture and delivery of this iron is to be fully accomplished. It was to be made with all reasonable dispatch by the use of the means at the command of the parties. Neither plaintiffs nor the Leland Company were bound to erect a new furnace or build vessels for the purpose of this contract. When the defendant notified the plaintiffs, the last of February or first of March, that it would receive no iron made after the first of

January, and in May gave notice that it would receive what was made up to and including December 1st, on condition of being discharged from further obligation under the contract, I have no doubt that a legal breach of this contract occurred, and the plaintiffs would have the right to treat the contract as repudiated by the defendant at that time; and plaintiffs were under no obligation to make the tender which they subsequently made of the iron. The plaintiffs, however, by their contract with the Leland Iron Company, were bound to receive this iron at Cleveland or Chicago, at the price fixed in their contract, and, I suppose, the plaintiffs were subjected to no special inconvenience or cost in making a tender of these cargoes, as the Leland Iron Company shipped them during the months of May, June, and July, 1881. The only legal effect of this tender, after the defendant's repudiation of the contract, it seems to me, was to keep the contract alive, so far as to enable the defendant to recede from its repudiation and accept the iron when tendered, and, perhaps, to give the defendant the benefit of any advance in the price; that is to say, if the defendant, after having given notice that it would not accept this iron, had, when these cargoes were tendered it from time to time, seen fit to accept it, it would have been a good performance on both sides, and have fully condoned the breach which was committed by the defendant at an earlier day, by their notice that they would not accept the iron.

Defendant also insists that the ore was not delivered by the plaintiffs to the furnace company in the proportions called for by the contract; defendant assuming that the ores were to be mixed for the purposes of making this pig-iron in the proportions of the quantities from the several mines, while the proof shows that there were 20 tons less "Cleveland ore" delivered than called for by the contract; 595 tons less "Norway," 22 tons less "Rolling mill," and 805 tons more "Stevenson" than was called for by the contract. But the proof shows that the quality of the Norway and Stevenson ores was the same; that the two mines were on the same vein, and close together, so that their workings ran into each other; as one witness says, the ores of the two mines were identical in quality and value, and these two ores cost plaintiffs the same price per ton, delivered on board vessel at Escanaba. It is true that the witness Emmerton, the chemist of the Joliet Iron & Steel Company, testified that he analyzed a single sample of Stevenson ore, which showed 97-1000 phosphorus, and 10 per cent. of silica; that he also analyzed two samples of Norway ore for phosphorus, one of which showed 21-1000 phosphorus, and 22½ per cent. silica, and the other showed 53-1000 phosphorus. The large amount of phosphorus shown in this single sample of Stevenson ore is, in my opinion, no criterion of the average amount of phosphorus in the bulk of the ore from that mine. The large difference in the quantity of phosphorus in the two samples of Norway ore examined by this witness is a sufficient illustration of the fallacy of re-

lying upon the analysis of a single specimen as a test of the average result of the whole product of a mine. The testimony of this witness, therefore, does not, in my estimation, establish an appreciable difference between the ores of the two mines; at least, it does not overcome the affirmative testimony that the ores are essentially alike.

By the contract with the Leland Company, these ores were to be mixed as directed by plaintiffs. No evidence of any direction by plaintiffs or defendant as to the mixing of the ores is put into the case. The defendant accepted the entire quantity of ore shipped during the season of 1880, without any complaint as to the quality of the iron, and even offered to take all that had been made up to the first of January, 1881, and no objection was raised as to the quality of their iron. I therefore conclude that these slight shortages in the quantities of Cleveland and Rolling-mill ore are in no sense material, and, indeed, the quantities are as close as can usually be practically arrived at in the transportation by vessel cargoes of so large volumes of any commodity, and that the excess of Stevenson ore over the Norway has in no perceptible way affected the character of the product of these masses of ores, and that these facts furnish no excuse for the breach of the contract by defendant. Undoubtedly, if plaintiffs, after the notice from defendant that it would not accept any more iron on the contract, saw fit to proceed and complete the contract and tender the iron, they were bound to a substantial compliance with the terms of their contract. But I see nothing in the proof showing that they did not substantially perform their contract.

Finding, as I do, from the proof in the case, that defendant has been guilty of a breach in its contract, the only question remaining is the measure of the plaintiffs' damages. This being a contract of sale, the obvious and natural rule of damages is the difference between the price which the defendant, by its contract, agreed to pay for this iron, and the market value of the iron at the time defendant refused to perform its contract. I do not think that plaintiffs can increase or enhance the damages by the tender of performance, after the notice by defendant, on or near the first of March, that it would not accept any more iron on the contract. This was a breach by defendant which fixed the measure of its liability. The defendant knew at the time this notice was given that plaintiffs had bought this iron from the Leland Iron Company, were bound to accept and pay for it on the terms of their contract with that company, and knew, therefore, that plaintiffs would have the iron on their hands, and be compelled to dispose of it on the best terms they could if the defendant did not accept it.

The rights of complainant, therefore, seem to me the same, as to the measure of compensation, as if plaintiffs had had the iron on hand and ready to deliver, and had tendered a delivery on the first

or, third of March. If, however, this iron had advanced in price between the first of March and the time the plaintiff tendered it to the defendant, so as to make less difference between the contract price and the market price, the difference between the market price and the contract price at the time of the tender would be the measure of damages. But I find from the proof there was very little difference in the price of Lake Superior iron between March and the first week in July, either in the Cleveland or Chicago markets. This iron was not a well-known brand, having a quotable market value; it was made on contract from certain ores, and had no established reputation. It may have been said to have been made for the defendant, and the defendant only, to be used in and about the defendant's business. The proof shows that plaintiffs did not put this iron on the market and attempt to sell it until about November, 1881, and that since that time they have been diligently endeavoring to sell it, but had up to the time of the trial only succeeded in disposing of about 1,000 tons, in comparatively small lots, at prices averaging about $30 per ton; but from this must be deducted expenses, such as storage, commissions for selling, etc. I do not consider these sales made by plaintiffs as any standard or criterion of the value of this iron in the spring or summer of 1881. I conclude, however, that the preponderance of proof justifies me in finding that this iron could not have been sold in any of the markets for pig-iron between the first of March and the first of August, 1881, for more than a net price of $27 per ton, which, deducted from the contract price of $45 per ton, gives the difference of $18 a ton, making a total of $82,422 as the difference between the market price of the iron and the contract price on the 4,579 tons; that is to say, I assume that the product of the 14,000 tons of ore would be, in round numbers, 8,000 tons of pig iron. Three thousand four hundred and twenty-one tons, in round numbers, were delivered in the fall of 1830, and it left 4,579 tons due on the contract after the opening of navigation in the spring of 1881. It will be remembered that there was delivered by the plaintiffs to the Leland rolling-mill the gross quantity of 14,168 tons, and the total amount of iron manufactured was 8,074; the 74 tons being manufactured, as I assume by the proof, from the excess of ore delivered by the plaintiff to the rolling-mill company, which, of course, the defendant is not chargeable with.